**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  20-3214
_____

JIM BOGNET, DONALD K. MILLER, DEBRA MILLER,
ALAN CLARK, JENNIFER CLARK,
                                        Appellants

v.

SECRETARY COMMONWEALTH OF PENNSYLVANIA;
ADAMS COUNTY BOARD OF ELECTIONS;
ALLEGHENY COUNTY BOARD OF ELECTIONS;
ARMSTRONG COUNTY BOARD OF ELECTIONS;
BEAVER COUNTY BOARD OF ELECTIONS; BEDFORD
COUNTY BOARD OF ELECTIONS; BERKS COUNTY
BOARD OF ELECTIONS; BLAIR COUNTY BOARD OF
ELECTIONS; BRADFORD COUNTY BOARD OF
ELECTIONS; BUCKS COUNTY BOARD OF
ELECTIONS; BUTLER COUNTY BOARD OF
ELECTIONS; CAMBRIA COUNTY BOARD OF
ELECTIONS; CAMERON COUNTY BOARD OF
ELECTIONS; CARBON COUNTY BOARD OF
ELECTIONS; CENTRE COUNTY BOARD OF
ELECTIONS; CHESTER COUNTY BOARD OF

ELECTIONS; CLARION COUNTY BOARD OF ELECTIONS; CLEARFIELD COUNTY BOARD OF ELECTIONS; CLINTON COUNTY BOARD OF ELECTIONS; COLUMBIA COUNTY BOARD OF ELECTIONS; CRAWFORD COUNTY BOARD OF ELECTIONS; CUMBERLAND COUNTY BOARD OF ELECTIONS; DAUPHIN COUNTY BOARD OF ELECTIONS; DELAWARE COUNTY BOARD OF ELECTIONS; ELK COUNTY BOARD OF ELECTIONS; ERIE COUNTY BOARD OF ELECTIONS; FAYETTE COUNTY BOARD OF ELECTIONS; FOREST COUNTY BOARD OF ELECTIONS; FRANKLIN COUNTY BOARD OF ELECTIONS; FULTON COUNTY BOARD OF ELECTIONS; GREENE COUNTY BOARD OF ELECTIONS; HUNTINGDON COUNTY BOARD OF ELECTIONS; INDIANA COUNTY BOARD OF ELECTIONS; JEFFERSON COUNTY BOARD OF ELECTIONS; JUNIATA COUNTY BOARD OF ELECTIONS; LACKAWANNA COUNTY BOARD OF ELECTIONS; LANCASTER COUNTY BOARD OF ELECTIONS; LAWRENCE COUNTY BOARD OF ELECTIONS; LEBANON COUNTY BOARD OF ELECTIONS; LEHIGH COUNTY BOARD OF ELECTIONS; LUZERNE COUNTY BOARD OF ELECTIONS; LYCOMING COUNTY BOARD OF ELECTIONS; MCKEAN COUNTY BOARD OF ELECTIONS; MERCER COUNTY BOARD OF ELECTIONS; MIFFLIN COUNTY BOARD OF ELECTIONS; MONROE COUNTY BOARD OF ELECTIONS; MONTGOMERY COUNTY BOARD OF ELECTIONS; MONTOUR COUNTY BOARD OF

ELECTIONS; NORTHAMPTON COUNTY BOARD OF ELECTIONS; NORTHUMBERLAND COUNTY BOARD OF ELECTIONS; PERRY COUNTY BOARD OF ELECTIONS; PHILADELPHIA COUNTY BOARD OF ELECTIONS; PIKE COUNTY BOARD OF ELECTIONS; POTTER COUNTY BOARD OF ELECTIONS; SCHUYLKILL COUNTY BOARD OF ELECTIONS; SNYDER COUNTY BOARD OF ELECTIONS; SOMERSET COUNTY BOARD OF ELECTIONS; SULLIVAN COUNTY BOARD OF ELECTIONS; SUSQUEHANNA COUNTY BOARD OF ELECTIONS; TIOGA COUNTY BOARD OF ELECTIONS; UNION COUNTY BOARD OF ELECTIONS; VENANGO COUNTY BOARD OF ELECTIONS; WARREN COUNTY BOARD OF ELECTIONS; WASHINGTON COUNTY BOARD OF ELECTIONS; WAYNE COUNTY BOARD OF ELECTIONS; WESTMORELAND COUNTY BOARD OF ELECTIONS; WYOMING COUNTY BOARD OF ELECTIONS; YORK COUNTY BOARD OF ELECTIONS

DEMOCRATIC NATIONAL COMMITTEE,
Intervenor

———————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 3-20-cv-00215
District Judge: Honorable Kim. R. Gibson

———————————

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 9, 2020

Before: SMITH, *Chief Judg*e, SHWARTZ and SCIRICA,
*Circuit Judges*

(Filed: November 13, 2020)

Brian W. Barnes
Peter A. Patterson
David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
        *Counsel for Appellants*

Mark A. Aronchick
Michele D. Hangley
Robert A. Wiygul
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103

J. Bart DeLone
Sean A. Kirkpatrick
Keli M. Neary
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

Dimitrios Mavroudis
Jessica Rickabaugh
Joe H. Tucker, Jr.
Tucker Law Group
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
*Counsel Secretary Commonwealth of Pennsylvania*

Elizabeth A. Dupuis
Molly E. Meachem
Babst Calland
330 Innovation Boulevard
Suite 302
State College, PA 16803
*Counsel for Armstrong, Bedford, Blair, Centre Columbia, Dauphin, Fayette, Huntingdon, Indiana, Lackawanna, Lawrence, Northumberland, Venango,* and *York County Boards of Elections*

Christine D. Steere
Deasey Mahoney & Valentini
103 Chesley Drive
Lafayette Building, Suite 101
Media, PA 19063
*Counsel for Berks County Board of Elections*

Edward D. Rogers
Elizabeth V. Wingfield
Ballard Spahr
1735 Market Street, 51st Floor
Philadelphia, PA 19103
*Counsel for Delaware County Board of Elections*

Stephen B. Edwards
Frank J. Lavery, Jr.
Andrew W. Norfleet
Lavery Law
225 Market Street
Suite 304, P.O. Box 1245
Harrisburg, PA 17108
*Counsel for Franklin* and *Perry*
*County Boards of Elections*

Thomas R. Shaffer
Glassmire & Shaffer Law Offices
5 East Third Street
P.O. Box 509
Coudersport, PA 16915
*Counsel for Potter County Board of Elections*

Marc E. Elias
Uzoma Nkwonta
Courtney A. Elgart
Perkins Coie
700 13th Street, N.W. Suite 800

-6-

Washington, D.C. 20005
*Counsel for Intervenor Democratic National Committee*

———————————

OPINION OF THE COURT

———————————

SMITH, *Chief Judge.*

> *A share in the sovereignty of the state, which is exercised by the citizens at large, in voting at elections is one of the most important rights of the subject, and in a republic ought to stand foremost in the estimation of the law.—* Alexander Hamilton[1]

The year 2020 has brought the country unprecedented challenges. The COVID-19 pandemic, which began early this year and continues today, has caused immense loss and vast disruption. As this is a presidential election year, the pandemic has also presented unique challenges regarding where and how citizens shall vote, as well as when and how their ballots shall be tabulated. The appeal on which we now rule stems from the disruption COVID-19 has wrought on the national elections. We reach our decision, detailed below, having carefully

---

[1] Second Letter from Phocion (April 1784), *reprinted in* 3 The Papers of Alexander Hamilton, 1782–1786, 530–58 (Harold C. Syrett ed., 1962).

considered the full breadth of statutory law and constitutional authority applicable to this unique dispute over Pennsylvania election law. And we do so with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count.

## I.  BACKGROUND & PROCEDURAL HISTORY

### A. The Elections and Presidential Electors Clause

The U.S. Constitution delegates to state "Legislature[s]" the authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's ability to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. This provision is known as the "Elections Clause." The Elections Clause effectively gives state governments the "default" authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69 (1997), with Congress retaining "exclusive control" to "make or alter" any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554 (1946). Congress has not often wielded this power but, "[w]hen exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *Ex Parte Siebold*, 100 U.S. 371, 384, 399 (1879) ("[T]he Constitution and constitutional laws of the [United States] are . . . the supreme law of the land; and, when they conflict with the laws of the States, they are of paramount authority and obligation."). By statute, Congress has set "[t]he Tuesday next after the 1st Monday in November, in every even numbered year," as the day for the election. 2 U.S.C. § 7.

Much like the Elections Clause, the "Electors Clause" of the U.S. Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors." U.S. Const. art. II, § 1, cl. 2. Congress can "determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4. Congress has set the time for appointing electors as "the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1.

This year, both federal statutes dictate that the day for the election was to fall on Tuesday, November 3 ("Election Day").

## B. Pennsylvania's Election Code

In keeping with the Constitution's otherwise broad delegation of authority to states to regulate the times, places, and manner of holding federal elections, the Pennsylvania General Assembly has enacted a comprehensive elections code. In 2019, the General Assembly passed Act 77, which (among other things) established "no-excuse" absentee voting in Pennsylvania[2]: all eligible voters in Pennsylvania may vote by mail without the need to show their absence from their voting district on the day of the election. 25 Pa. Stat. and Cons. Stat. §§ 3150.11–3150.17. Under Act 77, "[a]pplications for mail-in ballots shall be processed if received not later than five

---

[2] Throughout this opinion, we refer to absentee voting and mail-in voting interchangeably.

o'clock P.M. of the first Tuesday prior to the day of any primary or election." *Id.* § 3150.12a(a). After Act 77, "a completed absentee [or mail-in] ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election" for that vote to count. *Id*. §§ 3146.6(c), 3150.16(c).

## C. The Pennsylvania Supreme Court Decision

Soon after Act 77's passage, Donald J. Trump for President, Inc., the Republican National Committee ("RNC"), and several Republican congressional candidates and voters brought suit against Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania, and all of Pennsylvania's county boards of elections. That suit, filed in the Western District of Pennsylvania, alleged that Act 77's "no-excuse" mail-in voting regime violated both the federal and Pennsylvania constitutions. *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 4920952, at *1 (W.D. Pa. Aug. 23, 2020). Meanwhile, the Pennsylvania Democratic Party and several Democratic elected officials and congressional candidates filed suit in Pennsylvania's Commonwealth Court, seeking declaratory and injunctive relief related to statutory-interpretation issues involving Act 77 and the Pennsylvania Election Code. *See Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 2020 WL 5554644, at *1 (Pa. Sept. 17, 2020). Secretary Boockvar asked the Pennsylvania Supreme Court to exercise extraordinary jurisdiction to allow it to immediately consider the case, and her petition was granted without objection. *Id.* at *3.

-10-

Pending resolution of the Pennsylvania Supreme Court case, Secretary Boockvar requested that the Western District of Pennsylvania stay the federal case. *Trump for Pres. v. Boockvar*, 2020 WL 4920952, at \*1. The District Court obliged and concluded that it would abstain under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). *See Trump for Pres. v. Boockvar*, 2020 WL 4920952, at \*21. The RNC then filed a motion for limited preliminary injunctive relief asking that all mailed ballots be segregated, but the District Court denied the motion, finding that the plaintiffs' harm had "not yet materialized in any actualized or imminent way." *Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5407748, at \*1 (W.D. Pa. Sept. 8, 2020).

With the federal case stayed, the state court matter proceeded. The Pennsylvania Democratic Party argued that a combination of the COVID-19 pandemic and U.S. Postal Service ("USPS") mail-delivery delays made it difficult for absentee voters to timely return their ballots in the June 2020 Pennsylvania primary election. *Pa. Democratic Party*, 2020 WL 5554644, at \*10. The Pennsylvania Democratic Party claimed that this voter disenfranchisement violated the Pennsylvania Constitution's Free and Equal Elections Clause, art I., § 5,[3] and sought, among other things, a weeklong extension of the deadline for receipt of ballots cast by Election Day in the upcoming general election—the same deadline for the receipt of ballots cast by servicemembers residing overseas.

---

[3] The Free and Equal Elections Clause of the Pennsylvania Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. 1, § 5.

-11-

*Id.* at *2. Secretary Boockvar originally opposed the extension deadline; she changed her position after receiving a letter from USPS General Counsel which stated that Pennsylvania's ballot deadlines were "incongruous with the Postal Service's delivery standards," and that to ensure that a ballot in Pennsylvania would be received by 8:00 P.M. on Election Day, the voter would need to mail it a full week in advance, by October 27, which was also the deadline to *apply* for a mail-in ballot. *Id.* at *13; 25 Pa. Stat. and Cons. Stat. § 3150.12a(a). Secretary Boockvar accordingly recommended a three-day extension to the received-by deadline. *Pa. Democratic Party*, 2020 WL 5554644, at *12–13.

In a September 17, 2020 decision, the Pennsylvania Supreme Court concluded that USPS's existing delivery standards could not meet the timeline built into the Election Code and that circumstances beyond voters' control should not lead to their disenfranchisement. *Pa. Democratic Party*, 2020 WL 5554644, at *18. The Court accordingly held that the Pennsylvania Constitution's Free and Equal Elections Clause required a three-day extension of the ballot-receipt deadline for the November 3 general election. *Id.* at *18, *31. All ballots postmarked by 8:00 P.M. on Election Day and received by 5:00 P.M. on the Friday after Election Day, November 6, would be considered timely and counted ("Deadline Extension"). *Id.* at *31. Ballots postmarked or signed after Election Day, November 3, would be rejected. *Id.* If the postmark on a ballot received before the November 6 deadline was missing or illegible, the ballot would be presumed to be timely unless "a preponderance of the evidence demonstrates that it was mailed after Election Day" ("Presumption of Timeliness"). *Id.*

-12-

Shortly after the ruling, Pennsylvania voters were notified of the Deadline Extension and Presumption of Timeliness.

### D. Appeal to the U.S. Supreme Court, and This Litigation

The Republican Party of Pennsylvania and several intervenors, including the President pro tempore of the Pennsylvania Senate, sought to challenge in the Supreme Court of the United States the constitutionality of the Pennsylvania Supreme Court's ruling. Because the November election date was fast approaching, they filed an emergency application for a stay of the Pennsylvania Supreme Court's order pending review on the merits. The U.S. Supreme Court denied the emergency stay request in a 4-4 decision. *Republican Party of Pa. v. Boockvar*, No. 20A54, 592 U.S. __, 2020 WL 6128193 (Oct. 19, 2020); *Scarnati v. Boockvar*, No. 20A53, 592 U.S. __, 2020 WL 6128194 (Oct. 19, 2020). After denial of the stay, the petitioners moved for expedited consideration of their petition for certiorari. In denying that motion, Justice Alito noted that, per the Pennsylvania Attorney General, all county boards of elections would segregate ballots received during the Deadline Extension period from those received by 8:00 P.M. on Election Day. *Republican Party of Pa. v. Boockvar*, No. 20-542, 592 U.S. __, 2020 WL 6304626, at *2 (Oct. 28, 2020) (Alito, J., statement). Justice Alito later issued an order requiring that all county boards of elections segregate such ballots and count them separately. *Republican Party of Pa. v. Boockvar*, No. 20A84, 2020 WL 6536912 (Mem.) (U.S. Nov. 6, 2020) (Alito, J.).

In the meantime, on October 22, 2020, three days after the U.S. Supreme Court declined to stay the Pennsylvania Supreme Court's order, Plaintiffs herein filed this suit in the Western District of Pennsylvania. Plaintiffs are four registered voters from Somerset County, Pennsylvania, who planned to vote in person on Election Day ("Voter Plaintiffs") and Pennsylvania congressional candidate Jim Bognet. Defendants are Secretary Boockvar and each Pennsylvania county's board of elections.

Bognet, the congressional candidate, claimed that the Deadline Extension and Presumption of Timeliness "allow[] County Boards of Elections to accept votes . . . that would otherwise be unlawful" and "undermine[] his right to run in an election where Congress has paramount authority to set the 'times, places, and manner'" of Election Day. *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *2 (W.D. Pa. Oct. 28, 2020). The Voter Plaintiffs alleged that by voting in person, they had to comply with the single, uniform federal Election Day deadline, whereas mail-in voters could submit votes any time before 5:00 P.M. on November 6. *Id.* Thus, they alleged, the Pennsylvania Supreme Court treated them in an arbitrary and disparate way by elevating mail-in voters to a "preferred class of voters" in violation of the U.S. Constitution's Equal Protection Clause and the single, uniform, federal Election Day set by Congress. *Id.* The Voter Plaintiffs also asserted that counting ballots received after Election Day during the Deadline Extension period would unlawfully dilute their votes in violation of the Equal Protection Clause. *Id.*

All Plaintiffs sought to enjoin Defendants from counting ballots received during the Deadline Extension

period.  *Id.*  They also sought a declaration that the Deadline Extension and Presumption of Timeliness are unconstitutional under the Elections Clause and the Electors Clause as well as the Equal Protection Clause.  *Id.*  Because Plaintiffs filed their suit less than two weeks before Election Day, they moved for a temporary restraining order ("TRO"), expedited hearing, and preliminary injunction.  *Id.*

The District Court commendably accommodated Plaintiffs' request for an expedited hearing, then expeditiously issued a thoughtful memorandum order on October 28, denying the motion for a TRO and preliminary injunction.  *Id.* at \*7.  The District Court held that Bognet lacked standing because his claims were too speculative and not redressable.  *Id.* at \*3.  Similarly, the District Court concluded that the Voter Plaintiffs lacked standing to bring their Equal Protection voter dilution claim because they alleged only a generalized grievance.  *Id.* at \*5.

At the same time, the District Court held that the Voter Plaintiffs had standing to pursue their Equal Protection arbitrary-and-disparate-treatment claim.  But it found that the Deadline Extension did not engender arbitrary and disparate treatment because that provision did not extend the period for mail-in voters to actually cast their ballots; rather, the extension only directed that the timely cast ballots of mail-in voters be counted.  *Id.*  As to the Presumption of Timeliness, the District Court held that the Voter Plaintiffs were likely to succeed on the merits of their arbitrary-and-disparate-treatment challenge.  *Id.* at \*6.  Still, the District Court declined to grant a TRO because the U.S. Supreme Court "has repeatedly emphasized that . . . federal courts should ordinarily

-15-

not alter the election rules on the eve of an election." *Id.* at \*7 (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). The District Court concluded that with "less than two weeks before the election. . . . [g]ranting the relief Plaintiffs seek would result in significant voter confusion; precisely the kind of confusion that *Purcell* seeks to avoid." *Id.*

Plaintiffs appealed the denial of their motion for a TRO and preliminary injunction to this Court on October 29, less than a week before Election Day. Plaintiffs requested an expedited briefing schedule: specifically, their opening brief would be due on October 30 and the response briefs on November 2. Notably, Plaintiffs sought to file a reply brief on November 3—Election Day. Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 17. Defendants opposed the expedited briefing schedule, arguing that Plaintiffs' own delay had caused the case to reach this Court mere days before the election. Sec'y Boockvar's Opp. to Appellants' Emergency Mot. for Expedited Briefing, Dkt. No. 33. Defendants also contended that Plaintiffs sought to punish voters by invalidating the very rules mail-in voters had relied on when they cast their ballots. Defendants asked us to deny the motion for expedited briefing and offered to supply us with the actual numbers of mail-in ballots received during the Deadline Extension period together with an approximate count of how many of those mail-in ballots lacked legible postmarks. *Id.*

Even had we granted Plaintiffs' motion for expedited briefing, the schedule they proposed would have effectively foreclosed us from ruling on this appeal before Election Day. So we denied Plaintiffs' motion and instead ordered that their opening brief be filed by November 6. Order, No. 20-3214,

-16-

Oct. 30, 2020, Dkt. No. 37.  We directed Defendants to file response briefs by November 9, forgoing receipt of a reply brief.[4]  *Id.*  With the matter now fully briefed, we consider Plaintiffs' appeal of the District Court's denial of a TRO and preliminary injunction.

## II.    STANDARD OF REVIEW

The District Court exercised jurisdiction under 28 U.S.C. § 1331.  We exercise jurisdiction under § 1292(a)(1).

Ordinarily, an order denying a TRO is not immediately appealable.  *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 159 (3d Cir. 2020).  Here, although Bognet and the Voter Plaintiffs styled their motion as an Emergency Motion for a TRO and Preliminary Injunction, *see Bognet v. Boockvar*, No. 3:20-cv-00215, Dkt. No. 5 (W.D. Pa. Oct. 22, 2020), the District Court's order plainly went beyond simply ruling on the TRO request.

Plaintiffs filed their motion for a TRO and a preliminary injunction on October 22, along with a supporting brief. Defendants then filed briefs opposing the motion, with Plaintiffs filing a reply in support of their motion.  The District Court heard argument from the parties, remotely, during a 90-minute hearing.  The next day, the District Court ruled on the merits of the request for injunctive relief.  *Bognet*, 2020 WL 6323121, at \*7.  The District Court's Memorandum Order

---

[4] Because we have received comprehensive briefing, and given the weighty public interest in a prompt ruling on the matter before us, we have elected to forgo oral argument.

denied both Bognet and the Voter Plaintiffs the affirmative relief they sought to obtain prior to Election Day, confirming that the Commonwealth was to count mailed ballots received after the close of the polls on Election Day but before 5:00 P.M. on November 6.

In determining whether Bognet and the Voter Plaintiffs had standing to sue, we resolve a legal issue that does not require resolution of any factual dispute. Our review is de novo. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014). "When reviewing a district court's denial of a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision . . . for an abuse of discretion." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010)) (cleaned up).

## III.   ANALYSIS

### A. Standing

Derived from separation-of-powers principles, the law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted). Article III of the U.S. Constitution vests "[t]he judicial Power of the United States" in both the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. But this "judicial Power" extends only to "Cases" and "Controversies." *Id.* art. III, § 2; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

1547 (2016). To ensure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. *Spokeo*, 136 S. Ct. at 1547.

Article III standing doctrine speaks in jargon, but the gist of its meaning is plain enough. To bring suit, you—and you personally—must be injured, and you must be injured in a way that concretely impacts your own protected legal interests. If you are complaining about something that does not harm you—and does not harm you in a way that is concrete—then you lack standing. And if the injury that you claim is an injury that does no specific harm to you, or if it depends on a harm that may never happen, then you lack an injury for which you may seek relief from a federal court. As we will explain below, Plaintiffs here have not suffered a concrete, particularized, and non-speculative injury necessary under the U.S. Constitution for them to bring this federal lawsuit.

The familiar elements of Article III standing require a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the "invasion of a legally protected interest"; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560); *see also Mielo v. Steak 'n*

-19-

*Shake Operations*, 897 F.3d 467, 479 n.11 (3d Cir. 2018). The second sub-element requires that the injury "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. As for the third, when a plaintiff alleges future injury, such injury must be "certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2). Allegations of "possible" future injury simply aren't enough. *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). All elements of standing must exist at the time the complaint is filed. *See Lujan,* 504 U.S. at 569 n.4.

With these guideposts in mind, we turn to whether Plaintiffs have pleaded an Article III injury. They bring several claims under 42 U.S.C. § 1983, asserting deprivation of their constitutional rights. They allege that Defendants' implementation of the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness violates the Elections Clause of Article I, the Electors Clause of Article II, and the Equal Protection Clause of the Fourteenth Amendment. Because Plaintiffs lack standing to assert these claims, we will affirm the District Court's denial of injunctive relief.

### 1. Plaintiffs lack standing under the Elections Clause and Electors Clause.

Federal courts are not venues for plaintiffs to assert a bare right "to have the Government act in accordance with law." *Allen v. Wright*, 468 U.S. 737, 754 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–27 (2014). When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as

-20-

"generalized grievances" that cannot support standing. *United States v. Richardson*, 418 U.S. 166, 173–75 (1974). Such is the case here insofar as Plaintiffs, and specifically candidate Bognet, theorize their harm as the right to have government administered in compliance with the Elections Clause and Electors Clause.

To begin with, private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause. For example, in *Lance v. Coffman*, 549 U.S. 437 (2007) (per curiam), four private citizens challenged in federal district court a Colorado Supreme Court decision invalidating a redistricting plan passed by the state legislature and requiring use of a redistricting plan created by Colorado state courts. *Id.* at 438. The plaintiffs alleged that the Colorado Supreme Court's interpretation of the Colorado Constitution violated the Elections Clause "by depriving the state legislature of its responsibility to draw congressional districts." *Id.* at 441. The U.S. Supreme Court held that the plaintiffs lacked Article III standing because they claimed harm only to their interest, and that of every citizen, in proper application of the Elections Clause. *Id.* at 442 ("The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed."). Their relief would have no more directly benefitted them than the public at large. *Id.* The same is true here. If anything, Plaintiffs' "interest in the State's ability to 'enforce its duly enacted laws'" is even less compelling because Pennsylvania's "election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 591 U.S. __, 2020 WL 4680151 (Mem.), at *1 (Aug. 13, 2020) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018)).

-21-

Because the Elections Clause and the Electors Clause have "considerable similarity," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787,  839 (2015) (Roberts, C.J., dissenting) (discussing how Electors Clause similarly vests power to determine manner of appointing electors in "the Legislature" of each State), the same logic applies to Plaintiffs' alleged injury stemming from the claimed violation of the Electors Clause.  *See also Foster*, 522 U.S. at 69 (characterizing Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).

Even a party that meets Article III standing requirements must ordinarily rest its claim for relief on violation of its own rights, not those of a third party. *Pitt News v. Fisher*, 215 F.3d 354, 361–62 (3d Cir. 2000).  Plaintiffs assert that the Pennsylvania Supreme Court's Deadline Extension and Presumption of Timeliness usurped the General Assembly's prerogative under the Elections Clause to prescribe "[t]he Times, Places and Manner of holding Elections."  U.S. Const. art. I, § 4, cl. 1.  The Elections Clause grants that right to "the Legislature" of "each State."  *Id.*  Plaintiffs' Elections Clause claims thus "belong, if they belong to anyone, only to the Pennsylvania General Assembly." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) (per curiam).  Plaintiffs here are four individual voters and a candidate for federal office; they in no way constitute the General Assembly, nor can they be said to comprise any part of the lawmaking processes of Pennsylvania.  *Ariz. State Legislature*,

-22-

576 U.S. at 824.[5]  Because Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses.  No member of the General Assembly is a party to this lawsuit.

That said, prudential standing can suspend Article III's general prohibition on a litigant's raising another person's legal rights.  Yet Plaintiffs don't fit the bill.  A plaintiff may assert the rights of another if he or she "has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests."  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted).  Plaintiffs cannot invoke this exception to the rule against raising the rights of third parties because they enjoy no close relationship with the General Assembly, nor

---

[5] Bognet seeks to represent Pennsylvania in Congress, but even if he somehow had a relationship to *state* lawmaking processes, he would lack personal standing to sue for redress of the alleged "institutional injury (the diminution of legislative power), which necessarily damage[d] all Members of [the legislature] . . . equally."  *Raines v. Byrd*, 521 U.S. 811, 821 (1997) (plaintiffs were six out of 535 members of Congress); *see also Corman*, 287 F. Supp. 3d at 568–69 (concluding that "two of 253 members of the Pennsylvania General Assembly" lacked standing to sue under Elections Clause for alleged "deprivation of 'their legislative authority to apportion congressional districts'"); *accord Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019).

-23-

have they alleged any hindrance to the General Assembly's ability to protect its own interests. *See, e.g.*, *Corman*, 287 F. Supp. 3d at 573. Nor does Plaintiffs' other theory of prudential standing, drawn from *Bond v. United States*, 564 U.S. 211 (2011), advance the ball.

In *Bond*, the Supreme Court held that a litigant has prudential standing to challenge a federal law that allegedly impinges on the state's police powers, "in contravention of constitutional principles of federalism" enshrined in the Tenth Amendment. *Id.* at 223–24. The defendant in *Bond* challenged her conviction under 18 U.S.C. § 229, which Congress enacted to comply with a chemical weapons treaty that the United States had entered. *Id.* at 214–15. Convicted under the statute she sought to challenge, Bond satisfied Article III's standing requirements. *Id.* at 217 (characterizing Bond's sentence and incarceration as concrete, and redressable by invalidation of her conviction); *id.* at 224–25 (noting that Bond was subject to "[a] law," "prosecution," and "punishment" she might not have faced "if the matter were left for the Commonwealth of Pennsylvania to decide"). She argued that her conduct was "local in nature" such that § 229 usurped the Commonwealth's reserved police powers. *Id.* Rejecting the Government's contention that Bond was barred as a third party from asserting the rights of the Commonwealth, *id.* at 225, the Court held that "[t]he structural principles secured by the separation of powers protect the individual as well" as the State. *Id.* at 222 ("Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. . . . When government acts in excess of its lawful powers, that [personal] liberty is at stake.").

-24-

But the nub of Plaintiffs' argument here is that the Pennsylvania Supreme Court intruded on the authority delegated to the Pennsylvania General Assembly under Articles I and II of the U.S. Constitution to regulate federal elections. They do not allege any violation of the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Nor could they. After all, states have no inherent or reserved power over federal elections. *U.S. Term Limits*, 514 U.S. at 804–05. When "deciding issues raised under the Elections Clause," courts "need not be concerned with preserving a 'delicate balance' between competing sovereigns." *Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012). Either federal and state election law "operate harmoniously in a single procedural scheme," or they don't— and the federal law preempts ("alter[s]") state election law under the Elections Clause. *Id.* at 394. An assessment that the Pennsylvania Supreme Court lacked the legislative authority under the state's constitution necessary to comply with the Elections Clause (Appellants' Br. 24–27) does not implicate *Bond*, the Tenth Amendment, or even Article VI's Supremacy Clause.[6]  *See Gonzalez*, 677 F.3d at 390–92 (contrasting

[6] Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. *See Carson v. Simon*, No. 20-3139, 2020 WL 6335967, at *5 (8th Cir. Oct. 29, 2020). The *Carson* court appears to have

-25-

Elections Clause with Supremacy Clause and describing former as "unique," containing "[an] unusual delegation of power," and "unlike virtually all other provisions of the Constitution"). And, of course, third-party standing under *Bond* still presumes that the plaintiff otherwise meets the requirements of Article III; as discussed above, Plaintiffs do not.

Plaintiff Bognet, a candidate for Congress who is currently a private citizen, does not plead a cognizable injury by alleging a "right to run in an election where Congress has paramount authority," Compl. ¶ 69, or by pointing to a "threatened" reduction in the competitiveness of his election from counting absentee ballots received within three days after Election Day. Appellants' Br. 21. Bognet does not explain how that "right to run" affects him in a particularized way when, in fact, all candidates in Pennsylvania, including Bognet's opponent, are subject to the same rules. And Bognet does not explain how counting *more* timely cast votes would lead to a *less* competitive race, nor does he offer any evidence tending to show that a greater proportion of mailed ballots received after Election Day than on or before Election Day would be cast for Bognet's opponent. What's more, for Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment. *See, e.g.*, *Sibley v. Alexander*, 916 F. Supp. 2d 58, 62 (D.D.C.

cited language from *Bond* without considering the context—specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.

-26-

2013) ("[E]ven if the Court granted the requested relief, [plaintiff] would still fail to satisfy the redressability element [of standing] because enjoining defendants from casting the . . . votes would not change the outcome of the election." (citing *Newdow v. Roberts,* 603 F.3d 1002, 1011 (D.C. Cir. 2010) (citations omitted)). Bognet does not allege as much, and such a prediction was inherently speculative when the complaint was filed. The same can be said for Bognet's alleged wrongfully incurred expenditures and future expenditures. Any harm Bognet sought to avoid in making those expenditures was not "certainly impending"—he spent the money to avoid a speculative harm. *See Donald J. Trump for Pres., Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *36 (W.D. Pa. Oct. 10, 2020). Nor are those expenditures "fairly traceable" under Article III to the actions that Bognet challenges. *See, e.g.*, *Clapper*, 568 U.S. at 402, 416 (rejecting argument that plaintiff can "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending").[7]

Plaintiffs therefore lack Article III standing to challenge Defendants' implementation of the Pennsylvania Supreme

---

[7] The alleged injury specific to Bognet does not implicate the Qualifications Clause or exclusion from Congress, *Powell v. McCormack*, 395 U.S. 486, 550 (1969), nor the standing of members of Congress to bring actions alleging separation-of-powers violations. *Moore v. U.S. House of Reps.*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring).

Court's Deadline Extension and Presumption of Timeliness under the Elections Clause and Electors Clause.

## 2. The Voter Plaintiffs lack standing under the Equal Protection Clause.

Stressing the "personal" nature of the right to vote, the Voter Plaintiffs assert two claims under the Equal Protection Clause.[8] First, they contend that the influence of their votes, cast in person on Election Day, is "diluted" both by (a) mailed ballots cast on or before Election Day but received between Election Day and the Deadline Extension date, ballots which Plaintiffs assert cannot be lawfully counted; and (b) mailed ballots that were unlawfully cast (*i.e.*, placed in the mail) after Election Day but are still counted because of the Presumption of Timeliness. Second, the Voter Plaintiffs allege that the Deadline Extension and the Presumption of Timeliness create a preferred class of voters based on "arbitrary and disparate treatment" that values "one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). The Voter Plaintiffs lack Article III standing to assert either injury.

### a. Vote Dilution

As discussed above, the foremost element of standing is injury in fact, which requires the plaintiff to show a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1547–48 (citation omitted). The Voter Plaintiffs lack standing to

---

[8] Only the Voter Plaintiffs bring the Equal Protection count in the Complaint; Bognet did not join that count.

-28-

redress their alleged vote dilution because that alleged injury is not concrete as to votes counted under the Deadline Extension, nor is it particularized for Article III purposes as to votes counted under the Deadline Extension or the Presumption of Timeliness.

> i.    *No concrete injury from vote dilution attributable to the Deadline Extension.*

The Voter Plaintiffs claim that Defendants' implementation of the Deadline Extension violates the Equal Protection Clause because "unlawfully" counting ballots received within three days of Election Day dilutes their votes. But the source of this purported illegality is necessarily a matter of state law, which makes any alleged harm abstract for purposes of the Equal Protection Clause. And the purported vote dilution is also not concrete because it would occur in equal proportion *without* the alleged procedural illegality— that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively.[9]

---

[9] We exclude the Presumption of Timeliness from our concreteness analysis. Plaintiffs allege that the federal statutes providing for a uniform election day, 3 U.S.C. § 1 and 2 U.S.C. § 7, conflict with, and thus displace, any state law that would authorize voting after Election Day. They claim that the Presumption permits, theoretically at least, some voters whose ballots lack a legible postmark to vote *after* Election Day, in violation of these federal statutes. So unlike the Deadline Extension, Plaintiffs contend that the General Assembly could

The concreteness of the Voter Plaintiffs' alleged vote dilution stemming from the Deadline Extension turns on the federal and state laws applicable to voting procedures. Federal law does not provide for *when* or *how* ballot counting occurs. *See, e.g.*, *Trump for Pres., Inc. v. Way*, No. 20-cv-01753, 2020 WL 5912561, at *12 (D.N.J. Oct. 6, 2020) ("Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked."); *see also Smiley v. Holm*, 285 U.S. 355, 366 (1932) (noting that Elections Clause delegates to state lawmaking processes all authority to prescribe "procedure and safeguards" for "counting of votes"). Instead, the Elections Clause delegates to each state's lawmaking function the authority to prescribe such procedural regulations applicable to federal elections. *U.S. Term Limits*, 514 U.S. at 832–35 ("The Framers intended the Elections Clause to grant States authority to create procedural regulations . . . . [including] 'whether the electors should vote by ballot or vivâ voce . . . .'" (quoting James Madison, 2 Records of the Federal Convention of 1787, at 240 (M. Farrand ed. 1911) (cleaned up)); *Smiley*, 285 U.S. at 366 (describing state authority under Elections Clause "to provide a complete code for congressional elections . . . in

---

not enact the Presumption consistent with the Constitution. This conceptualization of injury is thus more properly characterized as "concrete" than is the purported Deadline Extension injury attributable to voters having their timely voted ballots received and counted after Election Day. That said, we express no opinion about whether the Voter Plaintiffs have, in fact, alleged such a concrete injury for standing purposes.

-30-

relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns"). That delegation of authority embraces all procedures "which experience shows are necessary in order to enforce the fundamental right involved." *Smiley*, 285 U.S. at 366. Congress exercises its power to "alter" state election regulations only if the state regime cannot "operate harmoniously" with federal election laws "in a single procedural scheme." *Gonzalez*, 677 F.3d at 394.

The Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously. At least 19 other States and the District of Columbia have post-Election Day absentee ballot receipt deadlines.[10]

---

[10] *See* AS § 15.20.081(e) & (h) (Alaska – 10 days after Election Day if postmarked on or before Election Day); West's Ann. Cal. Elec. Code § 3020(b) (California – three days after Election Day if postmarked on or before Election Day); DC ST § 1-1001.05(a)(10A) (District of Columbia – seven days after the election if postmarked on or before Election Day); 10 ILCS 5/19-8, 5/18A-15 (Illinois – 14 days after the election if postmarked on or before Election Day); K.S.A. 25-1132 (Kansas – three days after the election if postmarked before the close of polls on Election Day); MD Code, Elec. Law, § 9-505 (Maryland – the second Friday after Election Day if postmarked on or before Election Day); Miss. Code Ann. § 23-15-637 (Mississippi – five business days after Election Day if postmarked on or before Election Day); NV Rev Stat § 293.317 (Nevada – by 5:00 P.M. on the seventh day after Election Day

And many States also accept absentee ballots mailed by overseas uniformed servicemembers that are received after Election Day, in accordance with the federal Uniformed and Overseas

if postmarked by Election Day, and ballots with unclear postmarks must be received by 5:00 P.M. on the third day after Election Day); N.J.S.A. 19:63-22 (New Jersey – 48 hours after polls close if postmarked on or before Election Day); McKinney's Elec. Law § 8-412 (New York – seven days after the election for mailed ballots postmarked on Election Day); N.C. Gen. Stat. § 163-231(b)(2) and *Wise v. Circosta*, Nos. 20-2104, 20-2107, 2020 WL 6156302, at *2 (4th Cir. Oct. 20, 2020) (North Carolina – recognizing extension from three to nine days after the election the deadline for mail ballots postmarked on or before Election Day); Texas Elec. Code § 86.007 (the day after the election by 5:00 P.M. if postmarked on or before Election Day); Va. Code 24.2-709 (Virginia – by noon on the third day after the election if postmarked on or before Election Day); West's RCWA 29A.40.091 (Washington – no receipt deadline for ballots postmarked on or before Election Day); W. Va. Code, §§ 3-3-5, 3-5-17 (West Virginia – five days after the election if postmarked on or before Election Day); *see also* Iowa Code § 53.17(2) (by noon the Monday following the election if postmarked by the day before Election Day); NDCC 16.1-07-09 (North Dakota – before the canvass if postmarked the day before Election Day); R.C. § 3509.05 (Ohio – 10 days after the election if postmarked by the day before Election Day); Utah Code Ann. § 20A-3a-204 (seven to 14 days after the election if postmarked the day before the election).

Citizens Absentee Voting Act, 52 U.S.C. §§ 20301–20311. So the Voter Plaintiffs' only cognizable basis for alleging dilution from the "unlawful" counting of invalid ballots is state law defining lawful and unlawful ballot counting practices. *Cf. Wise v. Circosta*, Nos. 20-2104, 20-2107, 2020 WL 6156302, at \*5 (4th Cir. Oct. 20, 2020) ("Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain." (emphasis in original)), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72, 592 U.S. \_\_, 2020 WL 6305036 (Oct. 28, 2020). The Voter Plaintiffs seem to admit as much, arguing "that counting votes that are unlawful under the General Assembly's enactments will unconstitutionally dilute the lawful votes" cast by the Voter Plaintiffs. Appellants' Br. 38; *see also id.* at 31. In other words, the Voter Plaintiffs say that the Election Day ballot receipt deadline in Pennsylvania's codified election law renders the ballots untimely and therefore unlawful to count. Defendants, for their part, contend that the Pennsylvania Supreme Court's extension of that deadline under the Free and Equal Elections Clause of the state constitution renders them timely, and therefore lawful to count.

This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the

-33-

Constitution.") (cleaned up); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary). "It was not intended by the Fourteenth Amendment . . . that all matters formerly within the exclusive cognizance of the states should become matters of national concern." *Snowden v. Hughes*, 321 U.S. 1, 11 (1944).

Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019) ("'[V]ote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry *equal weight*." (emphasis added)); *cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) ("[N]o vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally."). As explained below, the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Trump for Pres. v. Boockvar,* 2020 WL

-34-

5997680, at \*45–46. That is not how the Equal Protection Clause works.[11]

Even if we were to entertain an end-run around the Voter Plaintiffs' lack of Elections Clause standing—by viewing the *federal* Elections Clause as the source of "unlawfulness" of Defendants' vote counting—the alleged vote dilution would not be a concrete injury. Consider, as we've noted, that the Voter Plaintiffs take no issue with the content of the Deadline Extension; they concede that the General Assembly, as other state legislatures have done, could have enacted exactly the same Deadline Extension as a valid "time[], place[], and manner" regulation consistent with the Elections Clause. *Cf. Snowden*, 321 U.S. at 8 (concluding that alleged "unlawful administration by state officers of a state statute *fair on its face*, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection" (emphasis added)); *Powell*, 436 F.2d at 88 ("Uneven or erroneous application of an *otherwise valid* statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'" (emphasis added) (quoting *Snowden*, 321 U.S. at 8)). Reduced to its essence, the

---

[11] *Bush v. Gore* does not require us to perform an Equal Protection Clause analysis of Pennsylvania election law as interpreted by the Pennsylvania Supreme Court. *See* 531 U.S. at 109 ("Our consideration is limited to the present circumstances . . . ."); *id.* at 139–40 (Ginsburg, J., dissenting) (discussing "[r]are[]" occasions when Supreme Court rejected state supreme court's interpretation of state law, one of which was in 1813 and others occurred during Civil Rights Movement—and none decided federal equal protection issues).

-35-

Voter Plaintiffs' claimed vote dilution would rest on their allegation that federal law required a different state organ to issue the Deadline Extension. The Voter Plaintiffs have not alleged, for example, that they were prevented from casting their votes, *Guinn v. United States*, 238 U.S. 347 (1915), nor that their votes were not counted, *United States v. Mosley*, 238 U.S. 383 (1915). Any alleged harm of vote dilution that turns not on the proportional influence of votes, but solely on the federal illegality of the Deadline Extension, strikes us as quintessentially abstract in the election law context and "divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1549 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). That the alleged violation here relates to election law and the U.S. Constitution, rather than the mine-run federal consumer privacy statute, does not abrogate the requirement that a concrete harm must flow from the procedural illegality. *See, e.g.*, *Lujan*, 504 U.S. at 576 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.").

The Voter Plaintiffs thus lack a concrete Equal Protection Clause injury for their alleged harm of vote dilution attributable to the Deadline Extension.

> ii. *No particularized injury from votes counted under the Deadline Extension or the Presumption of Timeliness.*

The opposite of a "particularized" injury is a "generalized grievance," where "the impact on plaintiff is plainly undifferentiated and common to all members of the public." *Id.* at 575 (cleaned up); *see also Lance*, 549 U.S. at

439. The District Court correctly held that the Voter Plaintiffs' "dilution" claim is a "paradigmatic generalized grievance that cannot support standing." *Bognet*, 2020 WL 6323121, at \*4 (quoting *Carson v. Simon*, No. 20-cv-02030, 2020 WL 6018957, at \*7 (D. Minn. Oct. 12, 2020), *rev'd on other grounds*, No. 20-3139, 2020 WL 6335967 (8th Cir. Oct. 29, 2020)). The Deadline Extension and Presumption of Timeliness, assuming they operate to allow the illegal counting of unlawful votes, "dilute" the influence of all voters in Pennsylvania equally and in an "undifferentiated" manner and do not dilute a certain group of voters particularly.[12]

Put another way, "[a] vote cast by fraud or mailed in by the wrong person through mistake," or otherwise counted illegally, "has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged." *Martel v. Condos*, No. 5:20-cv-00131, 2020 WL 5755289, at \*4 (D. Vt. Sept. 16, 2020). Such an alleged "dilution" is suffered equally by all voters and is not

---

[12] In their complaint, the Voter Plaintiffs alleged that they are all "residents of Somerset County, a county where voters are requesting absentee ballots at a rate *far less* than the state average" and thus, somehow, the Voter Plaintiffs' votes "will be diluted to a greater degree than other voters." Compl. ¶ 71 (emphasis in original). Plaintiffs continue to advance this argument on appeal in support of standing, and it additionally suffers from being a conjectural or hypothetical injury under the framework discussed *infra* Section III.A.2.b.ii. It is purely hypothetical that counties where a greater percentage of voters request absentee ballots will more frequently have those ballots received after Election Day.

"particularized" for standing purposes.  The courts to consider this issue are in accord.  *See id.*; *Carson*, 2020 WL 6018957, at \*7–8; *Moore v. Circosta*, Nos. 1:20-cv-00911, 1:20-cv-00912, 2020 WL 6063332, at \*14 (M.D.N.C. Oct. 14, 2020), *emergency injunction pending appeal denied sub nom. Wise v. Circosta*, Nos. 20-2104, 20-2017, 2020 WL 6156302 (4th Cir. Oct. 20, 2020), *application for injunctive relief denied sub nom. Moore v. Circosta*, No. 20A72 (U.S. Oct. 28, 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. Apr. 30, 2020).

But the Voter Plaintiffs argue that their purported "vote dilution" is an injury in fact sufficient to confer standing, and *not* a generalized grievance belonging to all voters, because the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).  "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage."  *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

The Voter Plaintiffs' reliance on this language from *Baker* and *Reynolds* is misplaced.  In *Baker*, the plaintiffs challenged Tennessee's apportionment of seats in its legislature as violative of the Equal Protection Clause of the Fourteenth Amendment.  369 U.S. at 193.  The Supreme Court held that the plaintiffs *did* have standing under Article III because "[t]he injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally

-38-

unjustifiable inequality *vis-à-vis* voters in irrationally favored counties." *Id.* at 207–08.

Although the *Baker* Court did not decide the merits of the Equal Protection claim, the Court in a series of cases—including *Gray v. Sanders*, 372 U.S. 368 (1963), and *Reynolds*—made clear that the Equal Protection Clause prohibits a state from "diluti[ng] . . . the *weight* of the votes of certain . . . voters merely because of where they reside[]," just as it prevents a state from discriminating on the basis of the voter's race or sex. *Reynolds*, 377 U.S. at 557 (emphasis added). The Voter Plaintiffs consider it significant that the Court in *Reynolds* noted—though not in the context of standing—that "the right to vote" is "individual and personal in nature." *Id.* at 561 (quoting *United States v. Bathgate*, 246 U.S. 220, 227 (1918)). The Court then explained that a voter's right to vote encompasses both the right to cast that vote and the right to have that vote counted without "debasement or dilution":

> The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347 [(1915)], *Lane v. Wilson*, 307 U.S. 268 [(1939)], nor destroyed by alteration of ballots, see *United States v. Classic*, 313 U.S. 299, 315 [(1941)], nor diluted by ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 [(1880)], *United States v. Saylor*, 322 U.S. 385 [(1944)]. As the Court stated in *Classic*, "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their

ballots and have them counted . . . ." 313 U.S., at 315.

…

 "The right to vote includes the right to have the ballot counted. . . . It also includes the right to have the vote counted at full value without dilution or discount. . . . That federally protected right suffers substantial dilution . . . [where a] favored group has full voting strength . . . [and] [t]he groups not in favor have their votes discounted."

*Reynolds*, 377 U.S. at 555 & n.29 (alterations in last paragraph in original) (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

Still, it does not follow from the labeling of the right to vote as "personal" in *Baker* and *Reynolds* that *any* alleged illegality affecting voting rights rises to the level of an injury in fact. After all, the Court has observed that the harms underlying a racial gerrymandering claim under the Equal Protection Clause "are personal" in part because they include the harm of a voter "being personally subjected to a racial classification." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) (cleaned up). Yet a voter "who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.'" *Gill*, 138 S. Ct. at 1930 (quoting *United States v. Hayes*, 515 U.S. 737, 745 (1995)) (alteration in original). The key inquiry

-40-

for standing is whether the alleged violation of the right to vote arises from an invidious classification—including those based on "race, sex, economic status, or place of residence within a State," *Reynolds*, 377 U.S. at 561—to which the plaintiff is subject and in which "the favored group has full voting strength and the groups not in favor have their votes discounted," *id.* at 555 n.29 (cleaned up). In other words, "voters who allege facts *showing disadvantage to themselves*" have standing to bring suit to remedy that disadvantage, *Baker*, 369 U.S. at 206 (emphasis added), but a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group. Here, no Pennsylvania voter's vote will count for less than that of any other voter as a result of the Deadline Extension and Presumption of Timeliness.[13]

---

[13] Plaintiffs also rely on *FEC v. Akins*, 524 U.S. 11 (1998), for the proposition that a widespread injury—such as a mass tort injury or an injury "where large numbers of voters suffer interference with voting rights conferred by law"—does not become a "generalized grievance" just because many share it. *Id.* at 24–25. That's true as far as it goes. But the Voter Plaintiffs have not alleged an injury like that at issue in *Akins*. There, the plaintiffs' claimed injury was their inability to obtain information they alleged was required to be disclosed under the Federal Election Campaign Act. *Id.* at 21. The plaintiffs alleged a statutory right to obtain information and that the same information was being withheld. Here, the Voter Plaintiffs' alleged injury is to their right under the Equal Protection Clause not to have their votes "diluted," but the

-41-

This conclusion cannot be avoided by describing one group of voters as "those . . . who lawfully vote in person and submit their ballots *on time*" and the other group of voters as those whose (mail-in) ballots arrive after Election Day and are counted because of the Deadline Extension and/or the Presumption of Timeliness. Appellants' Br. 33 (emphasis in original). Although the former group, under Plaintiffs' theory, should make up 100% of the total votes counted and the latter group 0%, there is simply no differential *weighing* of the votes. *See Wise*, 2020 WL 6156302, at *8 (Motz, J., concurring) ("But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters*. This is the core of an Equal Protection Clause challenge." (emphasis in original)). Unlike the malapportionment or racial gerrymandering cases, a vote cast by a voter in the so-called "favored" group counts not one bit more than the same vote cast by the "disfavored" group—no matter what set of scales one might choose to employ. *Cf. Reynolds*, 377 U.S. at 555 n.29. And, however one tries to draw a contrast, this division is not based on a voter's personal characteristics at all, let alone a person's race, sex, economic status, or place of residence. Two voters could each have cast a mail-in ballot before Election Day at the same time, yet perhaps only one of their ballots arrived by 8:00 P.M. on Election Day, given USPS's mail delivery process. It is passing strange to assume that one of these voters would be denied "equal protection of the laws" were *both* votes counted. U.S. Const. amend. XIV, § 1.

Voter Plaintiffs have not alleged that their votes are less influential than any other vote.

The Voter Plaintiffs also emphasize language from *Reynolds* that "[t]he right to vote can neither be denied outright . . . nor diluted by ballot-box stuffing." 377 U.S. at 555 (citing *Ex parte Siebold*, 100 U.S. 371 (1879); *United States v. Saylor*, 322 U.S. 385 (1944)). In the first place, casting a vote in accordance with a procedure approved by a state's highest court—even assuming that approval violates the Elections Clause—is not equivalent to "ballot-box stuffing." The Supreme Court has only addressed this "false"-tally type of dilution where the tally was false as a result of a scheme to cast falsified or fraudulent votes. *See Saylor*, 322 U.S. at 386. We are in uncharted territory when we are asked to declare that a tally that includes false or fraudulent votes is equivalent to a tally that includes votes that are or may be unlawful for non-fraudulent reasons, and so is more aptly described as "incorrect." *Cf. Gray*, 372 U.S. at 386 (Harlan, J., dissenting) ("[I]t is hard to take seriously the argument that 'dilution' of a vote in consequence of a legislatively sanctioned electoral system can, without more, be analogized to an impairment of the political franchise by ballot box stuffing or other criminal activity.").

Yet even were this analogy less imperfect, it still would not follow that every such "false" or incorrect tally is an injury in fact for purposes of an Equal Protection Clause claim. The Court's cases that describe ballot-box stuffing as an injury to the right to vote have arisen from criminal prosecutions under statutes making it unlawful for anyone to injure the exercise of another's constitutional right. *See, e.g.*, *Ex parte Siebold*, 100 U.S. at 373–74 (application for writ of habeas corpus); *Saylor*, 322 U.S. at 385–86 (criminal appeal regarding whether statute prohibiting "conspir[ing] to injure . . . any citizen in the free

-43-

exercise . . . of any right or privilege secured to him by the Constitution" applied to conspiracy to stuff ballot boxes); *Anderson v. United States*, 417 U.S. 211, 226 (1974) (criminal prosecution for conspiracy to stuff ballot boxes under successor to statute in *Saylor*).  Standing was, of course, never an issue in those cases because the Government was enforcing its criminal laws.  Here, the Voter Plaintiffs, who bear the burden to show standing, have presented no instance in which an individual voter had Article III standing to claim an equal protection harm to his or her vote from the existence of an allegedly illegal vote cast by someone else in the same election.

Indeed, the logical conclusion of the Voter Plaintiffs' theory is that whenever an elections board counts any ballot that deviates in some way from the requirements of a state's legislatively enacted election code, there is a *particularized* injury in fact sufficient to confer Article III standing on every other voter—provided the remainder of the standing analysis is satisfied.  Allowing standing for such an injury strikes us as indistinguishable from the proposition that a plaintiff has Article III standing to assert a general interest in seeing the "proper application of the Constitution and laws"—a proposition that the Supreme Court has firmly rejected.  *Lujan*, 504 U.S. at 573–74.  The Voter Plaintiffs thus lack standing to bring their Equal Protection vote dilution claim.

b.  Arbitrary and Disparate Treatment

The Voter Plaintiffs also lack standing to allege an injury in the form of "arbitrary and disparate treatment" of a preferred class of voters because the Voter Plaintiffs have not alleged a legally cognizable "preferred class" for equal

protection purposes, and because the alleged harm from votes counted solely due to the Presumption of Timeliness is hypothetical or conjectural.

### i. No legally protected "preferred class."

The District Court held that the Presumption of Timeliness creates a "preferred class of voters" who are "able to cast their ballots after the congressionally established Election Day" because it "extends the date of the election by multiple days for a select group of mail-in voters whose ballots will be presumed to be timely in the absence of a verifiable postmark."[14] *Bognet*, 2020 WL 6323121, at *6. The District Court reasoned, then, that the differential treatment between groups of voters is by itself an injury for standing purposes. To the District Court, this supposed "unequal treatment of voters . . . harms the [Voter] Plaintiffs because, as in-person voters, they must vote by the end of the congressionally established Election Day in order to have their votes counted." *Id*. The District Court cited no case law in support of its conclusion that the injury it identified gives rise to Article III standing.

The District Court's analysis suffers from several flaws. First, the Deadline Extension and Presumption of Timeliness apply to all voters, not just a subset of "preferred" voters. It is an individual voter's *choice* whether to vote by mail or in person, and thus whether to become a part of the so-called "preferred class" that the District Court identified. Whether to

_____

[14] The District Court did not find that the Deadline Extension created such a preferred class.

-45-

join the "preferred class" of mail-in voters was entirely up to the Voter Plaintiffs.

Second, it is not clear that the mere creation of so-called "classes" of voters constitutes an injury in fact. An injury in fact requires the "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560. We doubt that the mere existence of groupings of voters qualifies as an injury per se. "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)); *see also*, *e.g.*, *Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996) ("[T]he relevant prerequisite is unlawful discrimination, not whether plaintiff is part of a victimized class."). More importantly, the Voter Plaintiffs have shown no disadvantage to themselves that arises simply by being separated into groupings. For instance, there is no argument that it is inappropriate that some voters will vote in person and others will vote by mail. The existence of these two groups of voters, without more, simply does not constitute an injury in fact to in-person voters.

Plaintiffs may believe that injury arises because of a preference shown for one class over another. But what, precisely, is the preference of which Plaintiffs complain? In *Bush v. Gore*, the Supreme Court held that a State may not engage in arbitrary and disparate treatment that results in the valuation of one person's vote over that of another. 531 U.S. at 104–05. Thus, "the right of suffrage can be denied by a *debasement or dilution of the weight of a citizen's vote* just as effectively as by wholly prohibiting the free exercise of the

-46-

franchise." *Id.* at 105 (quoting *Reynolds*, 377 U.S. at 555) (emphasis added). As we have already discussed, vote dilution is not an injury in fact here.

What about the risk that some ballots placed in the mail after Election Day may still be counted? Recall that no voter—whether in person or by mail—is *permitted* to vote after Election Day. Under Plaintiffs' argument, it might theoretically be easier for one group of voters—mail-in voters—to illegally cast late votes than it is for another group of voters—in-person voters. But even if that is the case, no group of voters has the *right* to vote after the deadline.[15] We remember that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (citations omitted). And "a plaintiff lacks standing to complain about his inability to commit crimes because no one has a right to commit a crime." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014). Without a showing of discrimination or other intentionally unlawful conduct, or at least some burden on Plaintiffs' own voting rights, we discern no basis on which they have standing to challenge the slim opportunity the Presumption of Timeliness conceivably affords wrongdoers to violate election law. *Cf. Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1033 (8th Cir. 2013) (affirming dismissal of claims

---

[15] Moreover, we cannot overlook that the mail-in voters potentially suffer a *disadvantage* relative to the in-person voters. Whereas in-person ballots that are timely cast will count, timely cast mail-in ballots may not count because, given mail delivery rates, they may not be received by 5:00 P.M. on November 6.

"premised on potential harm in the form of vote dilution caused by insufficient pre-election verification of [election day registrants'] voting eligibility and the absence of post-election ballot rescission procedures").

### ii.     Speculative injury from ballots counted under the Presumption of Timeliness.

Plaintiffs' theory as to the Presumption of Timeliness focuses on the potential for some voters to vote after Election Day and still have their votes counted.  This argument reveals that their alleged injury in fact attributable to the Presumption is "conjectural or hypothetical" instead of "actual or imminent." *Spokeo*, 136 S. Ct. at 1547–48 (quoting *Lujan*, 504 U.S. at 560).  The Supreme Court has emphasized that a threatened injury must be "*certainly impending*" and not merely "*possible*" for it to constitute an injury in fact.  *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)).  When determining Article III standing, our Court accepts allegations based on well-pleaded facts; but we do not credit bald assertions that rest on mere supposition.  *Finkelman v. NFL*, 810 F.3d 187, 201–02 (3d Cir. 2016).  The Supreme Court has also emphasized its "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414.  A standing theory becomes even more speculative when it requires that independent actors make decisions to act *unlawfully*.  *See City of L.A. v. Lyons*, 461 U.S. 95, 105–06 & 106 n.7 (1983) (rejecting Article III standing to seek injunction where party invoking federal jurisdiction would have to establish that he would unlawfully resist arrest or police officers would violate department orders in future).

Here, the Presumption of Timeliness could inflict injury on the Voter Plaintiffs only if: (1) another voter violates the law by casting an absentee ballot after Election Day; (2) the illegally cast ballot does not bear a legible postmark, which is against USPS policy;[16] (3) that same ballot still arrives within three days of Election Day, which is faster than USPS anticipates mail delivery will occur;[17] (4) the ballot lacks sufficient indicia of its untimeliness to overcome the Presumption of Timeliness; and (5) that same ballot is ultimately counted. *See Donald J. Trump for Pres., Inc. v. Way*, No. 20-cv-10753, 2020 WL 6204477, at \*7 (D.N.J. Oct. 22, 2020) (laying out similar "unlikely chain of events" required for vote dilution harm from postmark rule under New Jersey election law); *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 43 (3d Cir. 2011) (holding purported injury in fact was too conjectural where "we cannot now describe how Appellants will be injured in this case without beginning our explanation with the word 'if'"). This parade of horribles "may never come to pass," *Trump for Pres. v. Boockvar*, 2020 WL 5997680, at \*33, and we are especially reluctant to endorse such a speculative theory of injury given Pennsylvania's "own mechanisms for deterring and prosecuting voter fraud,"

---

[16] *See* Defendant-Appellee's Br. 30 (citing 39 C.F.R. § 211.2(a)(2); Postal Operations Manual at 443.3).

[17] *See Pa. Democratic Party*, 2020 WL 5554644, at \*12 (noting "current two to five day delivery expectation of the USPS").

*Donald J. Trump for Pres., Inc. v. Cegavske*, No. 20-1445, 2020 WL 5626974, at *6 (D. Nev. Sept. 18, 2020).[18]

To date, the Secretary has reported that at least 655 ballots without a legible postmark have been collected within the Deadline Extension period.[19]  But it is mere speculation to say that any one of those ballots was cast after Election Day.  We are reluctant to conclude that an independent actor—here, one of 655 voters—decided to mail his or her ballot after Election Day contrary to law.  The Voter Plaintiffs have not provided any empirical evidence on the frequency of voter fraud or the speed of mail delivery that would establish a statistical likelihood or even the plausibility that any of the 655

---

[18] Indeed, the conduct required of a voter to effectuate such a scheme may be punishable as a crime under Pennsylvania statutes that criminalize forging or "falsely mak[ing] the official endorsement on any ballot," 25 Pa. Stat. & Cons. Stat. § 3517 (punishable by up to two years' imprisonment); "willfully disobey[ing] any lawful instruction or order of any county board of elections," *id.* § 3501 (punishable by up to one year's imprisonment); or voting twice in one election, *id.* § 3535 (punishable by up to seven years' imprisonment).

[19] As of the morning of November 12, Secretary Boockvar estimates that 655 of the 9383 ballots received between 8:00 P.M. on Election Day and 5:00 P.M. on November 6 lack a legible postmark.  *See* Dkt. No. 59.  That estimate of 655 ballots does not include totals from five of Pennsylvania's 67 counties:  Lehigh, Northumberland, Tioga, Warren, and Wayne.  *Id.*  The 9383 ballots received, however, account for all of Pennsylvania's counties.  *Id.*

ballots was cast after Election Day. Any injury to the Voter Plaintiffs attributable to the Presumption of Timeliness is merely "possible," not "actual or imminent," and thus cannot constitute an injury in fact.

### B. Purcell

Even were we to conclude that Plaintiffs have standing, we could not say that the District Court abused its discretion in concluding on this record that the Supreme Court's election-law jurisprudence counseled against injunctive relief. Unique and important equitable considerations, including voters' reliance on the rules in place when they made their plans to vote and chose how to cast their ballots, support that disposition. Plaintiffs' requested relief would have upended this status quo, which is generally disfavored under the "voter confusion" and election confidence rationales of *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). One can assume for the sake of argument that aspects of the now-prevailing regime in Pennsylvania are unlawful as alleged and still recognize that, given the timing of Plaintiffs' request for injunctive relief, the electoral calendar was such that following it "one last time" was the better of the choices available. *Perez,* 138 S. Ct. at 2324 ("And if a [redistricting] plan is found to be unlawful very close to the election date, the only reasonable option may be to use the plan one last time.").

Here, less than two weeks before Election Day, Plaintiffs asked the District Court to enjoin a deadline established by the Pennsylvania Supreme Court on September 17, a deadline that may have informed voters' decisions about whether and when to request mail-in ballots as well as when

-51-

and how they cast or intended to cast them. In such circumstances, the District Court was well within its discretion to give heed to Supreme Court decisions instructing that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) (citing *Purcell*, 549 U.S. at 1).

In *Purcell*, an appeal from a federal court order enjoining the State of Arizona from enforcing its voter identification law, the Supreme Court acknowledged that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." 549 U.S. at 4. In other words, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. Mindful of "the necessity for clear guidance to the State of Arizona" and "the imminence of the election," the Court vacated the injunction. *Id.* at 5.

The principle announced in *Purcell* has very recently been reiterated. First, in *Republican National Committee*, the Supreme Court stayed on the eve of the April 7 Wisconsin primary a district court order that altered the State's voting rules by extending certain deadlines applicable to absentee ballots. 140 S. Ct. at 1206. The Court noted that it was adhering to *Purcell* and had "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207 (citing *Purcell*, 549 U.S. at 1). And just over two weeks ago, the Court denied an application to vacate a stay of a district court order that made

similar changes to Wisconsin's election rules six weeks before Election Day. *Democratic Nat'l Comm. v. Wis. State Legislature*, No. 20A66, 592 U.S. __, 2020 WL 6275871 (Oct. 26, 2020) (denying application to vacate stay). Justice Kavanaugh explained that the injunction was improper for the "independent reason[]" that "the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents." *Id.* at *3 (Kavanaugh, J., concurring). *Purcell* and a string[20] of Supreme Court election-law decisions in 2020 "recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *Id.*

---

[20] *See, e.g.*, *Andino v. Middleton*, No. 20A55, 592 U.S. __, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring) ("By enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the *Purcell*] principle and this Court's precedents." (citations omitted)); *Merrill v. People First of Ala.*, No. 19A1063, 591 U.S. __, 2020 WL 3604049 (Mem.), at *1 (July 2, 2020); *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *see also Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 2020 WL 5951359, at *1 (7th Cir. Oct. 8, 2020) (per curiam) (holding that injunction issued six weeks before election violated *Purcell*); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. Oct. 2, 2020) ("[W]e are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed. An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute." (citing *Purcell*, 549 U.S. at 4–5)).

The prevailing state election rule in Pennsylvania permitted voters to mail ballots up through 8:00 P.M. on Election Day so long as their ballots arrived by 5:00 P.M. on November 6. Whether that rule was wisely or properly put in place is not before us now. What matters for our purposes today is that Plaintiffs' challenge to it was not filed until sufficiently close to the election to raise a reasonable concern in the District Court that more harm than good would come from an injunction changing the rule. In sum, the District Court's justifiable reliance on *Purcell* constitutes an "alternative and independent reason[]" for concluding that an "injunction was unwarranted" here. *Wis. State Legislature*, 2020 WL 6275871, at *3 (Kavanaugh, J., concurring).

## IV.  CONCLUSION

We do not decide today whether the Deadline Extension or the Presumption of Timeliness are proper exercises of the Commonwealth of Pennsylvania's lawmaking authority, delegated by the U.S. Constitution, to regulate federal elections. Nor do we evaluate the policy wisdom of those two features of the Pennsylvania Supreme Court's ruling. We hold only that when voters cast their ballots under a state's facially lawful election rule and in accordance with instructions from the state's election officials, private citizens lack Article III standing to enjoin the counting of those ballots on the grounds that the source of the rule was the wrong state organ or that doing so dilutes their votes or constitutes differential treatment of voters in violation of the Equal Protection Clause. Further, and independent of our holding on standing, we hold that the District Court did not err in denying Plaintiffs' motion for injunctive relief out of concern for the settled expectations of

-54-

voters and election officials. We will affirm the District Court's denial of Plaintiffs' emergency motion for a TRO or preliminary injunction.